UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
   :
UNITED STATES OF AMERICA
   :
    - v. -                                 18 Cr. 863 (VEC)
   :
ANTONIO DIMARCO,
   :
        Defendant.
   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

 

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Tara LaMorte
Abigail S. Kurland
Assistant United States Attorneys
   *-- Of Counsel --*

**Preliminary Statement**

The Government respectfully submits this memorandum in advance of the sentencing of defendant Antonio DiMarco ("the Defendant") scheduled for June 2, 2020. The Defendant repeatedly engaged in multiple fraud schemes, targeting over two dozen victims, and used the identities and financial information of others to facilitate his schemes. Furthermore, this course of conduct occurred over a significant time period. This criminal behavior is appropriately addressed through the imposition of a significant custodial sentence and an order of restitution.

**Statement of Facts**

I.   **Background**

DiMarco, working together with co-defendant Joaquim Von Ditmar and others, fraudulently attempted to acquire millions of dollars' worth of artworks from art galleries, auction houses, and private collectors from around the world, using a variety of methods, including through appropriating the identity and financial information of a victim ("Victim-1") without her authorization. (PSI ¶ 15.) As DiMarco and Von Ditmar failed repeatedly to obtain artworks they had contracted to buy, but never paid for, the scheme evolved. DiMarco and Von Ditmar then sought out ways to monetize artwork that they had not yet acquired—and might never acquire—by fraudulently representing to insurers and lenders that DiMarco owned artwork that he did not, in the hopes of obtaining loans based on the value of that artwork. (PSI ¶ 15.)

To date, the Government has identified approximately 27 auction houses and art galleries that were victims of DiMarco's crimes. Likewise, the Government has identified at least three individuals whose identities and/or financial information DiMarco used to facilitate his schemes. DiMarco's victims spent countless hours and resources engaging with DiMarco and his

coconspirators, and in turn lost income, rejected other legitimate offers to purchase works of art and expended money in connection with their scheme.[1]

II. **DiMarco Defrauds Auction Houses and Art Galleries**

In or about November 2017, DiMarco and Von Ditmar attempted to purchase artworks at a certain auction house ("Auction House-1"). (PSI ¶ 16.) Email communications between and among DiMarco, Von Ditmar, and representatives of Auction House-1 reveal that DiMarco and Von Ditmar obtained access to the auction through the use of Victim-1's identity documents, including her passport, and bank account information in the form of a letter from Victim-1's bank (the "Bank") indicating that Victim-1 held assets in excess of $7,000,000. (PSI ¶ 16.) Von Ditmar and DiMarco further presented information indicating that Victim-1 had authorized DiMarco and Von Ditmar to bid on two artworks by Mark Rothko and Ad Reinhardt on her behalf, and that Victim-1 was a manager of Empire Equity Investments, LLC, a Wyoming corporation. (PSI ¶ 16.) Without the "proof of funds" documents required by Auction House-1's "know your customer" policy and anti-money laundering protocols, DiMarco could not participate in the auction. Using Victim-1's identity and financial information, Von Ditmar and DiMarco successfully bid for the Rothko and the Reinhardt (the "Rothko and Reinhardt"), and thereby caused Victim-1 to enter into a purchase agreement with Auction House-1 for more than $7.5 million. (PSI ¶ 16.)

---

[1] In the Government's view, the victims' interest in a restitution order is one of the "specific reasons," within the meaning of Section 15002 *et seq*. of the CARES Act, sufficient to proceed with a video teleconference or telephone conference for DiMarco's sentencing. *See* H.R. 748, Section 15002 et seq., P.L. 116-136, signed into law on March 27, 2020 (noting that if "the district judge in a particular case finds for specific reasons that the . . . sentencing in that case cannot be further delayed without serious harm to the interests of justice, the . . . sentencing . . . may be conducted by video teleconference, or by telephone conference if video teleconferencing is not reasonably available"); *see also* Southern District of New York Standing Order, 20 MC 176*,* March 30, 2020.

In point of fact, Victim-1 knew nothing about DiMarco's and Von Ditmar's plans to purchase artworks in her name. (PSI ¶ 17.) Victim-1 was not affiliated with Empire Equity Investments, and had no idea what if any business Empire Equity Investments might conduct. When representatives of Auction House-1 contacted Victim-1 in the wake of the sale, Victim-1 was shocked to learn that she had purchased anything at Auction House-1, and was certain that a mistake had been made. (PSI ¶ 17.) Subsequently, she confronted DiMarco, who lied to Victim-1, assuring her that it was an error, and instructing her to ignore any future communications from Auction House-1. (PSI ¶ 17.)

For its part, Auction House-1 understood that it was selling these artworks to Victim-1, based on Victim-1's proof of funds, identity documents, and authorization letter provided to Auction House-1 by DiMarco and Von Ditmar. (PSI ¶ 18.) The identity of the buyer—and specifically the buyer's financial wherewithal—were of paramount importance to Auction House-1. (PSI ¶ 18.) As noted above, Auctions House-1 gathers this sort of information in connection with its anti-money laundering protocols. Without that information, Auction House-1 would not have allowed DiMarco and Von Ditmar to bid at auction. Furthermore, because Auction House-1 sold these artworks on consignment, it was contractually obligated to tender payment to the consigner upon the sale at auction, and because it never received payment from DiMarco and Von Ditmar, Auction House-1 sustained in excess of $1 million in losses. (PSI ¶ 18.)

Contemporaneous email communications between and among DiMarco, Von Ditmar and representatives of two additional auction houses located in Manhattan ("Auction House-2," and "Auction House-3," respectively) reveal that Von Ditmar and DiMarco continued to leverage Victim-1's identity documents and bank information in an attempt to attend auctions and secure

additional purchases at Auction House-2 and Auction House-3. (PSI ¶ 19.) For example, Von Ditmar forwarded Victim-1's passport and financial information to an employee of Auction House-2 on November 15, 2017, in an attempt to gain access to an auction at Auction House-2. Victim-1 did not know that DiMarco and Von Ditmar were using her identity in connection with bids at Auction House-2 and Auction House-3. (PSI ¶ 19.)

Throughout late 2017 through at least in or about May 2018, DiMarco and Von Ditmar executed sales agreements to purchase artworks from well over two dozen galleries and collectors throughout the world. (PSI ¶ 20.) Oftentimes, DiMarco claimed to be buying the paintings on behalf of a member of a wealthy Pittsburgh family to bolster DiMarco's negotiating bona fides. (PSI ¶ 22.) An interview with members of the aforementioned family revealed that they were unaware that DiMarco was leveraging their name as part of his scheme.

Von Ditmar maintained a spreadsheet that he periodically updated and emailed to DiMarco reflecting the status of their various purchases, including when payment was due, and in what amount. (PSI ¶ 20.) One such spreadsheet reflects completed sales agreements for more than 60 artworks listing total payments due in excess of $150 million. Among other works, purchases listed on that spreadsheet include a $16.5 million Matisse painting purchased "directly from the Matisse family, never been on the market! We have been negotiating since January 10[, 2018.]" (PSI ¶ 20.) According to the spreadsheet, payment on the Matisse was due March 15, 2018. Several versions of a document entitled "Bill of Sale" relating to the Matisse were recovered from Von Ditmar's email account, the latest in time version was dated April 6, 2018. (PSI ¶ 20.) Although they entered into binding contracts, Von Ditmar and DiMarco did not succeed in acquiring the Matisse, or any other work listed on the spreadsheet.

As payments on the artworks became due, the email record reflects that DiMarco and Von Ditmar attempted to stall the sellers in order to keep the sale agreements in place. To that end, Von Ditmar—who generally took the lead in interactions with the various sellers—sent increasingly elaborate and implausible explanations to the sellers, assuring them that payment was forthcoming. These emails were sent at the direction of and in consultation with DiMarco. For example, in connection with the purchase of a piece of art, on February 10, 2018, Von Ditmar blamed lack of payment on bank delays and the 13-hour time difference between the "client" and a bank in Hong Kong. In order to entice Gallery-1 to continue to hold the work for the defendants, Von Ditmar wrote that "$1bill ha[s] been set aside by the client through his Hong Kong holding company for the sole purpose of acquiring art and building a very important international art collection." (PSI ¶ 21.) Von Ditmar continued: "With me alone they have so far already acquired art for $98.442.000, that includes your invoice(s) and they have committed to another $118mill for a few select works." (PSI ¶ 21.) In truth, DiMarco and Von Ditmar did not succeed in acquiring any works, much less $98 million worth of artworks.

Further, there is no evidence to suggest that $1 billion was held by DiMarco, Von Ditmar, or anyone else they purported to represent in Hong Kong or elsewhere. As late as April 2018, Von Ditmar continued to provide Gallery-1 with excuses for non-payment, and assured them that a law firm who was working with the federal government's regulatory authorities[2] "has now guaranteed them that in maximum 33 days from today (possibly before) you will receive first payment." (PSI ¶ 21.) There is no evidence to suggest that the Law Firm was involved in this transaction in any way. Payment was never received by the victim.

---

[2] The law firm identified by Von Ditmar is a widely known international law firm.

5

According to several victims, a piece of art that was known within the art world to be "sold," either by word of mouth or having been marked sold online or at an art showcase, but is later back on the market, is considered "burned." A burned artwork is significantly more difficult to sell or is devalued by the market. Accordingly, when DiMarco lied and broke the terms of his contracts for sale, and then further lulled dealers into not immediately reselling the pieces, the gallerists, sales representatives and owners of the artwork lost money and commission.

### III.   DiMarco's Scheme to Monetize Artwork

As the conspiracy progressed, and as the defendants failed time and again to convince sellers to furnish them with artworks without first providing payment, DiMarco and Von Ditmar attempted to obtain value through other means. Beginning in or about May 2018 through their arrest in October 2018, the defendants sought to obtain loans based on the value of artworks that they sought to purchase, but did not own. (PSI ¶ 22.) On occasion, DiMarco represented to various individuals that he was purchasing this art on behalf of the aforementioned wealthy individual and his wife. (PSI ¶ 22.) In reality, this individual did not know DiMarco and the purported wife was a fiction. (PSI ¶ 22.)

In or about May 2018, DiMarco and Von Ditmar attempted to use the Matisse that they had been unsuccessful in acquiring as collateral to obtain financing from a lender. (PSI ¶ 23.) This aspect of the conspiracy is revealed, among other places, in text message exchanges between DiMarco and Von Ditmar. For example, in an exchange dated May 8, 2018, the defendants discussed where they could represent that the Matisse was being stored. Von Ditmar suggested a particular storage facility. DiMarco responded that, "the issue is[, is] it a place that $10 million in art would be secure[?]  If not the bank may request to move or see them[.]" (PSI ¶

6

23.) Once the defendants agreed that the storage facility under discussion would serve their purposes, and would not cause the bank to request to see the work (which would be disastrous for the scheme, considering that they did not possess the work), the defendants moved on to discuss the fraudulent documents that would be required to effectuate the scheme:

> DiMarco: So now [all] we need is the invoices and all the paperwork
>
> Von Ditmar: So I will write an invoice with all the paperwork etc
> DiMarco: Ok get as much paperwork as you can
> Von Ditmar: Yeah[.] I will copy one of those elaborate sales agreements ;)
>
> DiMarco: Ok lol
> Von Ditmar: Might as well lol
> DiMarco: I agree[.] It just needs to look as good as possible and professional and FAST! Lol

(PSI ¶ 23.) Later in the same exchange, the defendants exchanged a bill of sale agreement that the defendants created, purporting to reflect a sale of the Matisse by Von Ditmar to Empire Equity Investments. (PSI ¶ 24.) The defendants intended to use this false document to demonstrate to prospective lenders their ownership of the Matisse, in the hopes that those lenders would extend the defendants millions of dollars in credit secured by the Matisse. (PSI ¶ 24.)

In a subsequent text message exchange dated May 9, 2018, the defendants discussed obtaining an insurance policy for the Matisse, in order to further convince prospective lenders of the defendants' ownership interest. Von Ditmar contacted an insurance broker and reported back to DiMarco that the broker was willing to provide insurance "rapidly" and that the broker merely required information about the work and the owner:

> Von Ditmar: So in other words no viewing required! So I tell him to make the policy out to Empire[?]

7

> DiMarco: Yes that's fine but what invoice are you giving him?  I would just say you were the in between guy and did this in Jan[.]  I wouldn't send the real one. This is just for this to his bank [sic]
>
> Von Ditmar: The bill of sale between Empire/you and I[?]
>
> DiMarco: Ok great

(PSI ¶ 25.)  Here, Von Ditmar confirmed to DiMarco that a viewing of the Matisse was not required—again, an essential element of the scheme, given that the defendants did not possess it—and the defendants discussed providing the insurer with the false bill of sale they had created the previous day, rather than the actual bill of sale from their failed acquisition attempt.

The defendants continued to discuss the scheme through at least May 21, 2018.  At that time, DiMarco explained to Von Ditmar that "we need to show some sort of wire confirmation on the Matisse to your account[,]" in order to demonstrate to prospective lenders that the Matisse was actually purchased from Von Ditmar.  (PSI ¶ 27.) After some back-and-forth, during which Von Ditmar expressed skepticism that this could be achieved, Von Ditmar wrote:

> I would have to make up some entirely fake doc for that… like I said NO seller would EVER provide a bank statement to Any buyer!!! At BEST a copy of a notification form their bank with the credit to their account[.]  But to be honest I don't really like having to fake a bunch of documents which is definitely illegal without knowing if it one day will come to haunt me.

(PSI ¶ 27.)  Subsequently, in or about October 2018, DiMarco and Von Ditmar again attempted to secure a loan collateralized by artworks that they did not own.  A draft agreement entitled "Custody and Care Agreement" was recovered from Von Ditmar's email account.  (PSI ¶ 28.) The document purports to be a loan agreement listing DiMarco and Empire Equity Investments as borrowers, and a financial company (the "Credit Company") as the lender.  In relevant part,

8

the agreement states, "Empire Equity represents and warrants that it is the owner of the Artwork more particularly listed on Exhibit A[.]" Exhibit A of the agreement lists two artworks—one by Pierre-Auguste Renoir, and another by Edward Hopper. (PSI ¶ 28.) At the time, these works were valued at between $10 and $20 million; neither of these works have ever been owned by the defendants or by Empire Equity Investments.

Ultimately, DiMarco and Von Ditmar succeeded in having a duped seller lend them artwork, which they then had a lender appraise under the false pretense that they in fact owned it, for the purpose of securing a loan. (PSI ¶ 29.) After the artwork was appraised, but before any loan was issued, both were arrested.

### IV.  **DiMarco Defrauds Victim-1**

In or about 2014, Victim-1, who as noted above is elderly and was a recent widow, hired DiMarco to do work on her home in Florida. (PSI ¶ 30.) Over the course of several months, Victim-1 paid DiMarco for work that was never completed. Victim-1 also gave DiMarco around $50,000 to purchase a Chanel Diamond watch for Victim-1 and DiMarco never purchased the watch, but did not return the money. (PSI ¶ 30.)

In or about February 2016, DiMarco told Victim-1 that he needed money because he had millions of dollars that were "stuck" overseas. DiMarco needed to send $100,000 to someone in South Africa who would assist DiMarco to secure his fortune. (PSI ¶ 31.) On or about February 2, 2016, Victim-1 wired $100,000 through an intermediary for this purpose. In reality, DiMarco did not have a family fortune overseas or anywhere, and DiMarco never returned the money.

Victim-1 subsequently executed several other loans to DiMarco, ranging from $50,000 to $125,000 under false pretenses and in connection with various financial schemes. Victim-1

9

subsequently hired DiMarco to renovate Victim-1's New York home. DiMarco completed this work.

V. **DiMarco's Bank Fraud**

In or about May 2017, DiMarco was in regular contact with a real estate broker (the "Broker") who believed DiMarco was wealthy and interested in purchasing a multimillion dollar residential home in New York City. (PSI ¶ 34.) Due to misrepresentations DiMarco made to the Broker, the Broker believed that DiMarco could purchase property in the price range of $15 million and spent a substantial amount of time looking for real estate for DiMarco. Indeed, DiMarco represented that he owned luxury homes around the world, including in Monaco. In reality, DiMarco had no money. (PSI ¶ 34.)

At one point, a seller's agent required proof of funds or of a prior luxury real estate deal before continuing to interact with the Broker on DiMarco's behalf. (PSI ¶ 35.) In response, DiMarco emailed the Broker a doctored bank statement from Metro Bank, purporting to show over $477 million in DiMarco's bank account. (PSI ¶ 35.) In reality, and as revealed by emails recovered pursuant to a search warrant of DiMarco's account, the aforementioned Metro Bank statement was procured under false pretenses via email by DiMarco from an unwitting acquaintance who lived in Europe. (PSI ¶ 35.) DiMarco then altered the Metro Bank statement to make it look like it was DiMarco's account and that DiMarco had in excess of $477 million in liquid assets.

**Procedural History**

On November 7, 2019, the Defendant pleaded guilty before this Court to Count One of Indictment 18 Cr. 863, charging him with conspiracy to commit wire fraud. As part of the plea, the parties agreed that, pursuant to U.S.S.G. § 1B1.3, the Court may consider the conduct

charged in Count One of the Indictment, as well as the Defendant's additional and separate fraudulent schemes as relevant conduct in imposing sentence. Accordingly, the parties entered into a plea agreement, which, after considering the amount of loss, number of victims, and grouping analysis, arrived at an offense level of 26. The PSI concurs in this guidelines calculation. (PSI ¶ 7). Because the Defendant's prior federal conviction for unauthorized use of an access device was too old, it is not counted for criminal history purposes, and as such DiMarco is in criminal history category I. The Sentencing Guidelines recommends a sentence of 63 to 78 months' imprisonment and the Probation Office recommends a sentence of 63 months' imprisonment.

Furthermore, in the plea agreement, the Defendant also agreed to: (1) make restitution in at least the amount of $1,884,050.00 in accordance with 18 U.S.C. § 3663A; (2) make restitution in the amount of $500,000.00 to persons other than victims of the offense as specified by the Court; and (3) agreed that the obligation to make such restitution shall be made a condition of probation.

## Discussion

The scope and circumstances of the offenses, the prolonged nature of the schemes, and the sheer number of victims merit a Guidelines sentence. Moreover, protecting the public, incapacitation, and deterrence all weigh in favor of a serious sentence. 18 U.S.C. § 3553(a)(2)(A) (The particular custodial sentence imposed must be sufficient to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.").

   a. <u>A Sentence within the Guidelines is Appropriate</u>

First, the nature and circumstances of the offense justify a Guidelines sentence. In addition to auction houses, more than two dozen galleries and their employees, who depend on

the commission from their sales to earn a living, as well as collectors and artists, were repeatedly victimized by DiMarco. His lies deprived these victims of a portion of their livelihood. Furthermore, many victims informed the Government that once it became clear that a "sold" painting was back on the market because the victims finally realized DiMarco's promises of future payment were hollow, the painting was "burned," greatly diminishing the value of the painting in the fickle art world or making the painting difficult to sell at all. Accordingly, if the victims were able to re-sell the artwork, it was often at a diminished cost. In addition to the monetary loss, victims' reputations within the art world were negatively impacted by their interactions with DiMarco, further inhibiting their ability to earn a living. For example, for gallerists, who mostly sell in the primary market[3], in many instances relationships with the artists who provide the inventory were strained or ruined.

Furthermore, DiMarco's fraud was not isolated. Rather, his lies were repeated over and over again and involved nearly 30 domestic and international victims. His victims ranged from large international auction houses to small galleries, individual artists, an elderly widow and a real estate agent, whose income is dependent upon sales. When his lies caught up to him, rather than abandoning his schemes, DiMarco continued to string his victims along, further wasting their time and resources. For example one artist informed the Government that DiMarco "purchased" about $9,500.00 worth of the artist's work when it was displayed at Art Basel Miami. In turn, the art was marked "purchased" for the rest of the exhibition. DiMarco, however, did not pay for the artwork, but nevertheless for over six months he begged the artist not to sell to another purchaser and promised payment for the art he "purchased." Due to

---

[3] Galleries generally sell work in the primary market, i.e., directly from the artist, whereas auction houses sell art in the secondary market, i.e., from the private collections of individuals.

embarrassment, the artist decided not to sell the artwork once she realized that DiMarco had cheated her. Thus, the complex schemes, repeated lies, and lulling of victims required a sustained, consistent course of conduct that is plainly inconsistent with a momentary lapse in judgment or a short-lived error.

Also concerning is that in order to commit his crimes, DiMarco usurped the identity of several individuals so that his victims would believe he had the financial means to purchase the expensive art and homes. For example, Victim-1, an elderly widow who trusted DiMarco, invited DiMarco into her home; DiMarco in turn built a "friendship" with Victim-1 and used her to gain access to sales at auction houses. Likewise, DiMarco used the identity of a prominent family in Pittsburg – the defendant's hometown – to trick gallerists and others into believing that he was purchasing art for a member of the family. In reality, this individual had never even met DiMarco. Similarly, DiMarco sought out and used bank records from an acquaintance, doctored them and presented them to the real estate agent as proof of funds in order to access expensive Manhattan real estate. Again, DiMarco's *modus operendi* of using other people's identities and/or financial information to facilitate his crimes was repeated and sustained.

Accordingly, the nature and circumstances of DiMarco's schemes merit a sentence within the Guidelines range. Furthermore, because DiMarco's fraud, which targeted a wide variety of people, was complex and prolonged, persisted even after some victims threatened legal action, and was only stopped by his arrest, a Guidelines sentence is necessary in order to protect the public from DiMarco.

A Guidelines sentence is also necessary in order "to afford adequate deterrence to criminal conduct." *Id.* § 3553(a)(2)(B). It is the element of punishment, and particularly a custodial sentence, that is necessary to effectively prevent people from engaging in such crime in

the first place. *See United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence."). Unlike many defendants who are sentenced by the Court, this is not DiMarco's first federal criminal conviction. In the late 1990s, he was convicted of another federal crime, which, like the instant offense, also involved lying and an identifiable victim. Yet, DiMarco's previous federal conviction for access device fraud, for which he received a sentence of probation, did not deter the defendant from committing the instant offense. It stands to reason that the only way to impose a punishment that can be expected to have a deterrent effect would be to impose a term of incarceration.

In sum, a Guidelines sentence is necessary to adequately reflect the seriousness of the offense and meet the sentencing factors set forth in Section 3553.

b. The Restitution Order

In addition, the Court must order restitution pursuant to 18 U.S.C. § 3663A. 18 U.S.C. § 3663A(a)(1) and (c)(1)(B) ("[W]hen sentencing a defendant convicted of an offense [in which an identifiable victim has suffered a [] pecuniary loss, the court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense."). In his Plea Agreement, DiMarco agreed to make restitution in at least the amount of $1,884,050.00 in accordance with 18 U.S.C. § 3663A, and the defendant further agreed to make restitution in the amount of $500,000.00 to persons other than victims of the offense as specified by the Court. He also agreed that the obligation to make such restitution shall be made a

condition of probation, see 18 U.S.C. §3563(b)(2), or of supervised release, see 18 U.S.C. §3583(d). Attached for the Court's consideration is a proposed Order of Restitution.[4]

## Conclusion

For the foregoing reasons, a sentence within the Guidelines Range of 63 to 78 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

DATED:    May 19, 2020
                New York, New York

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Abigail S. Kurland
Assistant U.S. Attorney
Southern District of New York
Tel. (212) 637-2955

---

[4] Because Schedule A of the proposed Order of Restitution contains the name and identifying information victims, the Government respectfully requests that it be permitted to file Schedule A under seal.